**In the United States District Court
for the District of Kansas**

———————

Case No. 22-cv-02471-TC

———————

JENNIFER BLAINE,

*Plaintiff*

v.

MYSTERE LIVING & HEALTHCARE, INC.,

*Defendant*

———————

**MEMORANDUM AND ORDER**

Jennifer Blaine sued Mystere Living & Healthcare, Inc., alleging that it violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Doc. 10. Mystere moved for summary judgment. Doc. 48. For the following reasons, its motion is granted.

**I**

**A**

Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is necessary to resolve a claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. *Brown v. Perez*, 835 F.3d 1223, 1233 (10th Cir. 2016). Indeed, belaboring such disputes undermines the efficiency Rule 56 seeks to promote. *Adler*, 144 F.3d at 670.

1

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(d). To determine whether a genuine issue of fact exists, the Court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee, Okl.*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record, *see Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

In a case where the moving party does not bear the burden of persuasion at trial, the summary judgment rules require that party to show the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991); *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to dispositive matters. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

But in a case where the moving party will bear the burden of proof at trial on a particular issue, the moving party must meet "a more stringent summary judgment standard." *Pelt*, 539 F.3d at 1280; *see also Donner v. Nicklaus*, 778 F.3d 857, 876 (10th Cir. 2015) (discussing a movant with affirmative defenses). That standard requires the movant to "establish, as a matter of law, all essential elements of the issue." *Pelt*, 539 F.3d at 1280. Only then must the nonmovant "bring forward any specific facts alleged to rebut the movant's case." *Id.*

**B**

Mystere operates a facility called "Wellsville Health & Rehabilitation." *See* Doc. 49 at ¶ 1.[1] Blaine worked there as a Certified Occupational Therapy Assistant in the Therapy Department, before she was promoted to Director of Rehabilitation. Doc. 41 at ¶¶ 2.a.i–ii. Several

---

[1] All document citations are to the document and page number assigned in the CM/ECF system.

years after her promotion, "Tim Sullivan touched Blaine inappropriately." *Id.* at ¶ 2.a.iii. Sullivan was Wellsville's dietary manager and later worked in its business office. Doc. 49 at ¶¶ 2, 4; Doc. 53 at 6, ¶¶ 2, 4. Blaine reported the incident to Scott Averill, who owns Wellsville Health. Doc. 41 at ¶¶ 2.a.iv. Roughly two years later, she resigned. *Id.* at ¶ 2.a.v.

Blaine describes her history with and knowledge of Sullivan. He "made inappropriate jokes, stared at her chest for long periods of time, and patted his lap signalling for someone to sit." Doc. 49 at ¶ 6; Doc. 53 at 7, ¶ 6. These things happened "often" before he joined the business office, which might mean "a total of five times." *See* Doc. 49 at ¶ 7. And there were impliedly unexpected lapses: Blaine "traveled to Las Vegas with Sullivan in 2018, and Sullivan did not harass her on the trip." *Id.*

In the Spring of 2019, Blaine and Sullivan worked making omelets for Wellsville. *See* Doc. 49 at ¶ 8; Doc. 53 at 8, ¶ 8. Blaine describes Sullivan "looking for a pen" and "reach[ing] over and patt[ing] Blaine's butt, [saying] 'no pen in there.'" Doc. 49 at ¶ 9. She reported the incident to Averill, and Sullivan did not deny it. Doc. 49 at ¶ 9; Doc. 53 at 8, ¶ 9. Averill told Blaine she would not have to work with Sullivan at the omelet station again. Doc. 49 at ¶ 11; Doc. 53 at 8–9, ¶ 11. But in September 2020, they worked together at the omelet station once more. *See* Doc. 49 at ¶¶ 11–12; Doc. 53 at 9, ¶ 11–12. Averil, when Blaine confronted him about the situation, claimed that he had forgotten about this promise to avoid assigning both Blaine and Sullivan to the omelet station. Doc. 53 at ¶ 11. Nothing happened to Blaine while working with Sullivan at the omelet station in 2020. *Id.*

Still, Blaine heard Sullivan "make inappropriate jokes that 'had a sexual meaning' at multiple support team … meetings." Doc. 49 at ¶ 13. She "saw [him] pat his lap multiple times over the years." *Id.* at ¶ 15. And she "testified that she saw Sullivan smack a co-worker … on the backside with papers." *Id.* at ¶ 16; Doc. 53 at 10, ¶ 16. She stated that Sullivan did this with other women, too, but did not know to whom he did it. Doc. 49 at ¶ 17. Blaine never reported these things to anyone at Wellsville. *Id.* at ¶ 18.

In October 2021, Blaine saw Sullivan "take a blue glove and … 'ricochet' it off her co-worker, Darcy Schnoor's, bottom." Doc. 49 at ¶ 19. Security footage of this incident shows "Sullivan and Schnoor … snapping rubber gloves at one another." *Id.* at ¶ 20; Doc. 53 at 11, ¶

3

20. Upon seeing the incident, Blaine asked Schnoor "if she was okay." Doc. 49 at ¶ 21. Schnoor said "she had not noticed what Sullivan had done" but "began revealing past inappropriate conduct by Sullivan." *Id.*

Blaine and Schnoor then met with Averill and told him about the glove incident. *See* Doc. 49 at ¶ 23; Doc. 53 at 12, ¶ 23. Schnoor also submitted a written complaint about "conduct by Sullivan that had occurred over the course of two years." Doc. 49 at ¶ 40. Averill watched a video of the glove incident, then spoke with Sullivan. Doc. 49 at ¶¶ 24–25; Doc. 53 at 12–13, ¶¶ 24–25. He allowed Sullivan to return to work after concluding "that [Schnoor's] allegations were not corroborated." Doc. 49 at ¶ 27. After these events, Blaine "did not experience or report any harassment by Sullivan." *Id.* at ¶ 28. But other employees began reporting instances of Sullivan's conduct. *Id.* at ¶ 42. For example, the parties seem to agree that Maria Rios "claimed that Sullivan acted inappropriately toward" her. *Id.* at ¶ 43. This caused Rios to feel sick, per a conversation she had with Schnoor in October 2021. Blaine documents other misconduct claims too: Heather Staley's October 2021 allegation that Sullivan said "I'd do anything for you," Doc. 53-5 at 1, Kristen Zahner's November 2021 allegation that Sullivan was rude to Rios, Doc. 53-6 at 1, and Maggie Prince's allegation that she heard about Sullivan's treatment of Rios, Doc. 53-7 at 1; *see also* Doc. 53 at 28 (noting that Schnoor, Staley, Zahner, and Prince made their misconduct reports in October 2021).

Blaine resigned her position November 9, 2021, a few weeks after she and Schnoor met with Averill, by way of a two week's notice. *See* Doc. 49 at ¶ 30. But she did not work until her last day. *Id.* at ¶ 31; Doc. 53 at 14, ¶ 31. The parties vigorously dispute how to characterize Blaine's departure. *See* Doc. 53 at 14, ¶¶ 30–31. Blaine claims that "she intended to resign on November 23, 2021," though she declared these intentions on November 9. *See id.* at 14, ¶ 30. Mystere says she "resigned on November 9, 2021, providing notice that her last day would be in two weeks." Doc. 49 at ¶ 30. Mystere then told Blaine that "November 12 would be her last day," Doc. 49 at ¶¶ 30 & 31, or in Blaine's words, "directed [her] not to return to work as her services were no longer needed," Doc. 53 at 14, ¶ 31. Nonetheless, Mystere paid "all wages and benefits, including [Blaine's] accumulated paid time off, through her last day of November 23, 2021." Doc. 49 at ¶ 32.

Wellsville never told Blaine "that she had performance issues and, upon receiving notice of her resignation, Averill told her she did a great

4

job and would be missed." Doc. 49 at ¶ 35. Nonetheless, "Blaine felt like she was forced to resign." *Id.* at ¶ 36. She felt that "[Averill] was not going to change anything with [Sullivan] or the incidents that [the] women came forward with." *Id.*

Soon after she left Wellsville, Blaine secured other employment. Doc. 49 at ¶ 37. She was no longer working as a Certified Occupational Therapist Assistant, but "still had an opportunity to teach COTA students [at Neosho County Community College] and was using her license in that way." *Id.* at ¶¶ 37, 39.

Blaine filed an Equal Employment Opportunity Commission charge in June 2022. Doc. 49 at ¶ 45. She received a right-to-sue letter and sued in federal court. Doc. 1 at ¶ 5. She has since amended her complaint to add factual assertions about Sullivan's conduct, but her claims remain substantially the same. *Compare* Doc. 10, *with* Doc. 1. Mystere moved for summary judgment, Doc. 48, arguing that Blaine cannot prevail on any of her claims, Doc. 49.

Blaine has three claims, all asserted under Title VII. The first claim alleges a hostile working environment due to Sullivan's "[c]omments, touching, and/or harassment." Doc. 41 at ¶ 4.a.i. The second claim alleges retaliation. To substantiate that claim, Blaine says she reported "sexually inappropriate behavior related to herself and others, was retaliated against for doing so, and [was] ultimately constructively discharged." *Id.* at ¶ 4.a.ii. The final claim alleges that Mystere discriminated against Blaine because she is female. Doc. 49 at ¶ 4.a.iii. Unlike her male counterparts, Blaine was not "allowed to sexually harass female employees and face no consequences" and was instead "the subject of constant sexual harassment." *Id.*

Mystere moves for summary judgment on each claim. It says Blaine's discrimination charge was not timely, and contends that the facts fail to support "severe or pervasive harassment." Doc. 49 at 1. Nor, in Mystere's view, could a "reasonable jury find [that Blaine] suffered an adverse employment action" sufficient to establish retaliation or gender discrimination. *Id.* Even if it could, Mystere says, the gender discrimination claim would fail because Blaine was not similarly situated to Sullivan. *Id.*

## II

Even when viewing the facts in the light most favorable to Blaine, she could not demonstrate to a jury that her workplace was hostile, that she was retaliated against, or that she was subject to sex discrimination. As a result, Mystere is entitled to summary judgment on all three of Blaine's claims.

### A

Blaine's first claim alleges a hostile work environment. This claim falls under Title VII, which prohibits employers from discriminating "against any individual … because of such individual's … sex." 42 U.S.C. § 2000e-2(a)(1). A sex-discrimination claim based on indirect evidence, at least at summary judgment, is evaluated within the *McDonnell Douglas* framework. *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021) (citation omitted); *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). That framework requires a plaintiff to present a prima facie case of discrimination. *Throupe*, 988 F.3d at 1251. A plaintiff's employer may then "articulate a legitimate, non-discriminatory reason for its actions." *Id.* If the employer does so, the plaintiff must return with evidence that "the employer's articulated reasons are pretextual." *Id.* Otherwise, a court will grant summary judgment for the employer. *Id.*

#### 1

Blaine alleges harassment spanning several years, across a series of separate incidents. A preliminary question, then, is which allegations can contribute to her hostile work environment claim.

The answer to that question is defined by federal law. Plaintiffs must file timely Title VII charges with the EEOC or state agencies before suing. 42 U.S.C. § 2000e–5(e)(1). Kansas plaintiffs have 300 days to file a timely charge. *See Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1206 n.3 (10th Cir. 2007); *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1183 n.1 (10th Cir. 2003). This rule accommodates discrete acts. But "[h]ostile environment claims are different in kind from discrete acts" because "[t]heir very nature involves repeated conduct." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). That repeated conduct may "span a period longer than 300 days." *Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1308 (10th Cir. 2005). Accordingly, courts faced with such claims "may consider the

complete history of acts comprising that hostile work environment" so long as one contributing act "took place no more than 300 days before the plaintiff filed an EEOC charge." *Id.*; *see also Morgan*, 536 U.S. at 117. Put differently, something must connect acts within the statutory period to acts beyond that period. If something does, the 300-day period no longer limits the plaintiff.

Blaine filed her charge in June 2022. Doc. 49 at ¶ 45. Thus, her statutory period runs 300 days prior, to August 2021. It covers Sullivan's October 19, 2021 act of "tak[ing] a blue glove and … 'ricochet[ing]' it off [Blaine's] co-worker, Darcy Schnoor's, bottom." *Id.* at ¶ 19. But it might not cover most everything else: the spring-2019 omelet station incident, many of Sullivan's inappropriate jokes, and Sullivan "smack[ing] … Schnoor[] on the backside with papers." Doc. 49 at ¶¶ 7, 13–16; Doc. 53 at 10, ¶ 16. These incidents are timely asserted only if they relate to the blue glove incident. *See Duncan*, 397 F.3d at 1308.

Several factors recognized in Tenth Circuit decisions addressing this issue help explain why the other incidents relate to the blue glove incident. *Hansen v. SkyWest Airlines*, 844 F.3d 914, 923 (10th Cir. 2016). One factor, whether an employee "was working in the same place," plainly cuts for Blaine. *Id.* (quoting *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008)). So does another, asking whether alleged harassment stems from the same perpetrator, since Sullivan connects all the alleged incidents. *Id.* The other common factors—type and frequency—are closer calls. *See Tademy*, 614 F.3d at 1143 (acknowledging that these are not exclusive factors). But on balance, they also cut for Blaine. For instance, she describes Sullivan's conduct as consistent across time. He made rude gestures and comments, sometimes directed and sometimes undirected. Doc. 49 at 16. His inappropriate conduct occurred "often" before 2019, then escalated when he worked with Blaine at the omelet station in early 2019. *Id.* at 15. He did not touch Blaine again. *See* Doc. 53 at 8, ¶ 10. But Blaine believes he might have continued making comments, although she fails to identify when that may have happened or how many times it may have occurred. *See id.* (implying without stating that he did so) (referencing Doc. 53-1 at 12). Later, Blaine saw "other inappropriate conduct or statements by Sullivan that was either directed at other employees or toward no one in particular." *Id.* A jury could look at these facts and find a consistent thread: Sullivan did not say something every day, but he said something "often." *Id.* He did not do something to Blaine every time they were together, but he did so sometimes. *Id.* Ultimately, Blaine could

7

convince a jury that such conduct was part of Sullivan's course of conduct toward Blaine. *See Hansen*, 844 F.3d at 923 (reviewing what constitutes a single "actionable hostile work environment practice").

While Blaine is not always specific about timing, *see, e.g.*, Doc. 53 at ¶¶ 13, 15, that imprecision is not necessarily fatal. *Contra* Doc. 49 at 17 (arguing that Blaine's allegations should be disregarded because they are vague). As the Tenth Circuit has noted, courts "must remain flexible in a context as fact-specific and sensitive as employment discrimination and as amorphous as hostile work environment." *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1229 (10th Cir. 2022) (citation and internal quotation marks omitted). To be sure, many of Blaine's allegations lack details. She does not contest that she "was not able to give any examples of … [Sullivan's] jokes" and "did not know whether [they] referenced anatomy or were directed at a specific person." *Id.* at 20 14. And she was unsure whether the lap-patting was "directed at any particular person," or "how many times [it] occurred" over the years. *Id.* at ¶ 15.

Blaine's imprecision is not as important as Mystere urges. For instance, Mystere cites an unpublished case, *Nettle v. Cent. Okla. Am. Indian Health Council, Inc.*, for the proposition that Blaine must be more specific with her factual allegations, Doc. 49 at 17 (citing 334 F. App'x 914, 921 (10th Cir. 2009)), but concedes (as it must) that the unpublished panel decision also recognized that "[a] hostile work environment claimant need not establish precise dates for every insult" and that vagueness might be "inconsequential" in the context of a particular claim. 334 F. App'x at 921. Blaine could have been more specific, but her allegations are nonetheless connected for purposes of resolving the summary judgment motion. *See Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 959 (10th Cir. 2012) (plaintiff who "was often able to narrow the time frame to a particular month or time of year" was adequately specific when alleging a racially hostile work environment).

Nor are Blaine's allegations unconnected because "for some other reason, such as certain intervening action by the employer, the later acts are no longer part of the same hostile work environment claim." *Hansen*, 844 F.3d at 923 (citation and internal quotation marks omitted). Mystere makes this argument, pointing out that Sullivan's conduct sometimes abated, Doc. 49 at 19–20, and arguing that Sullivan was effectively reprimanded, *id.* at 21. In Mystere's view, these intervening events severed any link between Sullivan's old conduct and his new conduct. *Id.* And it allegedly means that Blaine cannot connect her

experiences across time. *Id.* None of those arguments persuade. As discussed, Sullivan's conduct was more or less consistent across time. Courts routinely find that similar situations present issues of fact for a jury to resolve. *See, e.g.*, *Ford*, 45 F.4th at 1229 (plaintiff could reference old conduct even though it implicated a different perpetrator). In short, Blaine can include all of her experiences at Wellsville when arguing for her claims.

**2**

All that only sets up the scope of Blaine's hostile work environment claim. She still has to show—at least to avoid summary judgment—that the alleged incidents constitute discrimination based on sex. An employer discriminates on the basis of sex, violating Title VII, when it creates a hostile work environment or fails to stop its employees from creating one. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998); *Throupe*, 988 F.3d at 1251. In either case, an employer's request for summary judgment on a hostile work environment claim can be overcome if a plaintiff demonstrates two things. First, that "he [or she] was discriminated against because of his [or her] sex." *Throupe*, 988 F.3d at 1251. Second, "that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of his [or her] employment." *Id.*

Not all offensive conduct is objectively severe. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). And objectively severe conduct is not enough on its own, since Title VII does not apply "if the victim does not subjectively perceive the environment to be abusive." *Id.* In such cases "the conduct has not actually altered the conditions of the victim's employment." *Id.* at 21–22. More concretely, then, Blaine has to show two things. She must have found "the workplace … permeated with discriminatory intimidation, ridicule, and insult." *Ford*, 45 F.4th at 1228 (citation and internal quotation marks omitted). This is the subjective prong. She must also produce evidence capable of convincing a rational jury that she was right about the workplace hostility. *Id.* This is the objective prong.

There is sufficient evidence that Blaine found her workplace subjectively hostile.² *See* Doc. 53 at 7–8, ¶¶ 6, 8; Doc. 49 at ¶¶ 2, 7, 19. For example, Sullivan "made inappropriate jokes, stared at her chest for long periods of time, and patted his lap." Doc. 49 at ¶ 6. He snapped a blue glove on Schnoor, *id.* at ¶ 19, and "patted Blaine's butt" while working the omelet breakfast with her, *id.* at ¶ 8.

Even so, she cannot prevail on her hostile workplace claim because she could not convince a reasonable jury that her workplace was objectively "permeated with discriminatory intimidation, ridicule, and insult." *Cf. Ford*, 45 F.4th at 1228 (citation and internal quotation marks omitted). That question requires holistic analysis, meaning that "the totality of the circumstances is the touchstone." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015) (cleaned up). While all the circumstances must be considered, some are particularly relevant. These include "the frequency of the discriminatory conduct" and "its severity." *Id.* In addition, the Tenth Circuit instructs courts to consider whether the alleged discriminatory conduct "is physically threatening or humiliating" or "a mere offensive utterance." *Id.* And it matters whether the conduct "unreasonably interferes with an employee's work performance." *Id.* Additionally, the Tenth Circuit recognizes that "whether conduct qualifies as severe or pervasive is particularly unsuited for summary judgment because it is quintessentially a question of fact." *Ford*, 45 F.4th at 1228 (citation and internal quotation marks omitted).

Mystere is entitled to summary judgment on the hostile work environment claim because the facts, even viewed in the light most favorable Blaine, fail to identify conduct that that a reasonable jury could find either pervasive or severe. The alleged incidents are so infrequent that no reasonable jury could find that Blaine endured a workplace permeated with hostile or offensive conduct. *Cf. Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1263 (10th Cir. 1998) ("The gender-

---

² Mystere cites *Bird v. W. Valley City* and argues that Blaine cannot rely on other employees' experiences if she was not aware of those experiences as they happened. *See* Doc. 49 at 11 (citing 832 F.3d 1188, 1207 (10th Cir. 2016)). Unlike the *Bird* plaintiff, Blaine learned about other employees' similar stories of harassment while working at Wellsville, not in discovery. *Cf. Bird*, 832 F.3d at 1207. *Hirase-Doi*, another of Mystere's cases, is similar. Doc. 49 at 10 (citing *Hirase-Doi v. U.S. W. Commc'ns, Inc.*, 61 F.3d 777, 782 (10th Cir. 1995)).

based incidents were spread out over a period of more than three years and are insufficient to establish a discriminatorily hostile environment."). Nor are they egregious enough to create a hostile work environment. *Cf. Morris v. City of Colorado Springs*, 666 F.3d 654, 667 (10th Cir. 2012).

Blaine cannot prove that pervasive harassment created a hostile work environment. *Contra* Doc. 53 at 25–27. Sullivan's conduct, including "inappropriate jokes," "star[ing] at [Blaine's] chest for long periods of time," and "patt[ing] his lap signaling for someone to sit," was plainly inappropriate. Mystere concedes as much. *See* Doc. 49 at 2. But no reasonable jury could find that Sullivan's conduct was so frequent, severe, and threatening that it permated the workplace with unlawful discrimination. *Brown v. LaFerry's LP Gas Co.*, 708 F. App'x 518, 522–23 (10th Cir. 2017) (affirming dismissal of a hostile work environment claim based on three offensive comments over six months because the comments—even combined with "the cold shoulder … from [the plaintiff's] coworkers"—were not suffiently severe or pervasive); *Al-Kazaz v. Unitherm Food Sys., Inc.*, 594 F. App'x 460, 463 (10th Cir. 2014) (affirming dismissal where three offensive comments were not enough to support a hostile work environment claim); *Nettle*, 334 F. App'x at 922 (affirming dismissal of a claim asserting "'frequent' racial comments at staff meetings" along with co-worker statements "that there was discrimination"); *cf. Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 682 (10th Cir. 2007) (noting that roughly six discrete incidents, along with "evidence of other ongoing harassment" in a four year period, presented a "close question" requiring a jury).

Sullivan's conduct allegedly "went on for years both before and after the April 2019 butt patting incident." Doc. 53 at 7, ¶ 6 By "went on for years," Blaine means that these incidents happened five times or "often" across many years. *See id.* at 7–8, ¶ 7. That is not frequent enough to present a jury question. *Ford* provides a useful comparison. In *Ford*, a female employee "identified evidence that she was repeatedly asked sexually explicit questions." 45 F.4th at 1230. By "repeatedly," the *Ford* plaintiff meant "on a daily basis." *Id.* Other employees agreed with her that such "sexual banter" was "constant." *Id.* So constant, in fact, "that one employee said, 'it would be easier to list [the employees] who didn't participate than the ones who did.'" *Id.* (alteration in original). And since either frequency or severity are enough to support a hostile work environment claim, *id.*, the *Ford* plaintiff's claim had to go to a jury.

11

Blaine's claim lacks the persistent remarks present in *Ford*. Persistent remarks are necessary because "a few isolated incidents of sporadic slurs" do not create a pervasively hostile environment. *Morris*, 666 F.3d at 666 (citation and internal alterations omitted). "Instead, there must be a steady barrage of opprobrious comments." *Id.* (internal alterations omitted). Blaine does not describe a steady barrage, she identifies only infrequent boorish incidents distributed over several years.

That remains true even considering the comments that Blaine learned about from other employees.[3] Few facts suggest that the "atmosphere" at Wellsville changed much after these discoveries. Blaine learned from Schnoor that Sullivan "would stare at her [i.e., Schnoor's] pelvic area, her chest and would stop to stare at [her] while bending over." Doc. 53 at 3, ¶ 11. He "made sexually inappropriate comments to … Schnoor." *Id.* And he "encouraged … Schnoor to date multiple men, older men and to cheat on her significant other." *Id.* at 3, ¶ 12. Such conduct is inappropriate in any setting. That said, Blaine already knew that Sullivan "made inappropriate jokes" and "stared" because he did it to her or "someone" in meeting rooms. *Id.* at 7, ¶ 6. Those incidents were infrequent, relative to Blaine's tenure at Wellsville. Accordingly, Schnoor's comments do little to amplify the alleged hostile work environment. Indeed, they appear to duplicate some of Blaine's other allegations. *See* Doc. 53 at 24. And even if there is no duplication, there are not enough discovered incidents to turn frequency into a jury question.

Courts sometimes find relatively few incidents capable of creating a hostile work environment. *See, e.g.*, *Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1415 (10th Cir. 1997) (six incidents); *Walker v. United Parcel Serv. of Am., Inc.*, 76 F. App'x 881, 887 (10th Cir. 2003) (thirteen incidents). But they do so when those few incidents are compressed into a small window of time. *See, e.g.*, *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 799 (10th Cir. 2007) (four-month period); *Walker*, 76 F. App'x at 887 (eight-month period for eight comments); *but see Smith*, 129 F.3d at 1415 (twenty-three month period). Blaine alleges a handful of incidents occurring over several years. In cases like hers, courts tend to find that a jury's input is unnecessary; the alleged harassment simply

---

[3] As noted, a jury would be able to consider those comments. Blaine learned about them while she was still at work, so they contributed to her perception of the "general work atmosphere." *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir. 1987); *see also Bird*, 832 F.3d at 1207.

is not pervasive. *See, e.g.*, *Penry*, 155 F.3d at 1263 (concluding that incidents "spread out over a period of more than three years" were "too few and far between to be considered sufficiently severe or pervasive") (internal quotation marks omitted); *Kline v. Utah Anti–Discrimination and Labor Division*, 418 F. App'x 774, 783 (10th Cir. 2011) (noting that "two inappropriate jokes and a few overheard comments which contained sexual innuendo are not severe or pervasive enough to create a hostile work environment"); *Jones v. Wichita State Univ.*, 528 F. Supp. 2d 1222, 1240 (D. Kan. 2007) (finding no "genuine issue of material fact whether [plaintiff's] workplace was permeated" with harassment where "over a 20–month period" a coworker "'fondled,' 'groped' or 'molested' plaintiff's hand perhaps twice a week when she passed objects to him").

Frequency is not the only way to prevail on a hostile work environment claim. Severity is an independent reason to find for a plaintiff, and thus a separate possible jury question. *See Ford*, 45 F.4th at 1230. But no reasonable jury could find that Blaine alleges adequately severe conduct. With one exception, she was subject to "mere offensive utterance[s]." *Lounds*, 812 F.3d at 1222. And that exception—the omelet station incident where Sullivan "patted Blaine's butt," Doc. 49 at ¶ 8—is not enough on its own. Isolated incidents suffice when they are "especially egregious or extreme." *Morris*, 666 F.3d at 667. The omelet station incident was not "especially egregious or extreme." Contrast it with *Morris*, in which the Tenth Circuit surveyed cases presenting examples of egregious conduct: rapes, broken limbs, bites, and other such abuses. *Id.* (collecting cases "consistent with [the Tenth Circuit's]" own cases). Blaine's facts do not rise to the extreme level of conduct described in cases where a single incident is severe enough to create a pervasively hostile workplace. *Id.* at 667–68; *see also Holmes v. Utah, Dep't of Workforce Servs.*, 483 F.3d 1057, 1065 (10th Cir. 2007) (contestedly unwelcome back rub was not enough, on its own, to create a "sexually hostile work environment").

**B**

Blaine's second claim alleges retaliation—specifically, that Mystere retaliated against her for "reporting sexually inappropriate behavior." Doc. 41 at ¶ 4.a.i. She relies on circumstantial evidence for this claim, so she must again proceed under the *McDonnell Douglas* framework. *Hansen*, 844 F.3d at 925; *see also Ford*, 45 F.4th at 1213 (noting that direct evidence of discrimination in the employment context "is usually impossible to obtain") (internal quotation marks omitted). *McDonnell*

*Douglas* starts with the plaintiff's prima facie case. And a prima facie retaliation case starts, if at all, when a plaintiff opposes sex-based discrimination. *Hansen*, 844 F.3d at 925. If that opposition triggers adverse action, and "a reasonable employee" would find that action "materially adverse," then the plaintiff states a prima facie case. *See id.*

Mystere does not dispute that Blaine opposed sex-based discrimination—presumably, she did so by reporting Sullivan's misconduct. *See* Doc. 49 at 2, 26. Instead, Mystere says "she cannot establish an action that was materially adverse." *Id.* at 26. "Materially adverse," at least in this context, means something that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation and internal quotation marks omitted); *see also Muldrow v. City of St. Louis*, 601 U.S. ----, 144 S. Ct. 967, 976 (2024) (refusing to import "the [retaliation] standard into the anti-discrimination provision at issue"). Thus, adverse employment actions include "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ford*, 45 F.4th at 1222 (internal quotation marks omitted).

Blaine cannot show that she suffered an adverse employment action. The only retaliatory act she identifies is when Mystere "terminate[d] [her] employment rather than allow her to continue to work through her resignation date." Doc. 53 at 34. In other words, she separates the day she delivered her resignation from the day that she intended it to be effective. After Blaine notified Mystere that she intended to stop working as of November 23, 2021, Mystere then told Blaine not to return to work after November 12, 2021, but paid her through November 23, 2021. Doc. 49 at ¶ 32; Doc. 53 at 14, ¶ 31. This does not constitute adverse action, because adverse actions in the retaliation context must cause "significant" harm. *Muldrow*, 144 S. Ct. at 976. Actions "caus[ing] less serious harm … will not deter Title VII enforcement" and therefore "fall[] outside the purposes of the ban on retaliation." *Id.*

And indeed, Blaine's allegations fall outside the ban on retaliation. Courts generally do not treat paid but unworked notice periods—like Blaine's—as adverse actions. *Compare Wynn v. Paragon Systems, Inc.*, 301 F.Supp.2d 1343, 1354 (S.D. Ga. 2004) (finding no adverse action where employer terminated employee upon a two-weeks' notice, but then paid "severance pay" equivalent to that period's wages), *with*

*Rodriguez v. Wet Ink, LLC*, No. 08-CV-00857, 2012 WL 1079006, at *8 (D. Colo. Mar. 30, 2012) (employee who tendered two-weeks' notice was "effectively depriv[ed] … of two weeks' wages" when she was neither required to work nor paid for her final two weeks); *see also Cover v. OSF Healthcare Sys.*, No. 3:18-CV-50114, 2023 WL 6541319, at *8 (N.D. Ill. Oct. 6, 2023) (collecting cases for the proposition that "where the employee is still compensated despite not working after giving notice of resignation, courts have not found an adverse employment action"). That approach makes sense. When Mystere accelerated Blaine's final day of work, she had already committed to resign. Mystere therefore did not change her employment status for the worse. *Cf. Ford*, 45 F.4th at 1222. The same is true of her benefits, since Mystere did not adjust her pay. *Cf. id.* With that in mind, Blaine lacks any evidence to convince a jury that she suffered any harm because of her resignation. To the contrary, she was not required to work the remainder of her intended time but was still paid as if she had done so. That warrants summary judgment, because "Title VII protects individuals not from all retaliation but only from retaliation that produces an injury or harm." *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1087 (10th Cir. 2007) (citation and internal quotation marks omitted).

Nor could Blaine prevail on a constructive discharge theory. Doc. 41 at ¶ 4.a.ii (preserving this argument with respect to her retaliation claim). A constructive discharge "occurs when a reasonable person in the employee's position would view her working conditions as intolerable and would feel that she had no other choice but to quit." *Ford*, 45 F.4th at 1235 (citation omitted). Proving intolerable working conditions is a substantial burden, because proof of actionable harassment is not itself enough. *Id.* Instead, the question is "whether the employee has any other reasonable choice but to resign in light of the employer's actions." *Id.* (citation and internal quotation marks omitted).

Blaine could not show that she was constructively discharged. The record evidence does not indicate that she faced a choice between resigning and losing her job, *cf. Tran v. Trustees of State Colleges in Colorado*, 355 F.3d 1263, 1271 (10th Cir. 2004), or that she resigned in light of an impending penalty, *cf. E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 806 (10th Cir. 2007). Instead, she points to harassment against other employees that she learned about a few weeks before she resigned, and notes that she was made to work a second omelet breakfast with Sullivan more than a year before she resigned. *See* Doc. 53 at 32. But "[a]

constructive discharge requires a showing that the employer's actions are not merely adverse, but intolerable." *Id.*

Even when viewing the facts in the light most favorable to Blaine, no jury could conclude that Mystere's actions were intolerable. Requiring Blaine to work another breakfast with Sullivan, even after promising not to do so, is not enough. *Cf. Tran*, 355 F.3d at 1271 (concluding that a person who felt distressed by close monitoring did not establish a claim of constructive discharge). Nor was it intolerable that Mystere brought Sullivan back to work after investigating reports about his conduct. *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 640 (10th Cir. 2012), *abrogated on other grounds by Muldrow*, 144 S. Ct. 967 ("[A] failure to investigate a complaint, unless it leads to demonstrable harm, leaves an employee no worse off than before the complaint was filed.").

Naturally, Blaine sees things differently. She reasons that "Defendant's message was loud and clear in October 2021 – shut up or get out." Doc. 53 at 32. Even accepting that Blaine felt this way, it is not enough. *See Brown v. Austin*, 13 F.4th 1079, 1093 (10th Cir. 2021) (concluding that a plaintiff's "subjective view [was] not sufficient; he must show that conditions were objectively unbearable"). A jury could not conclude that any reasonable person in Blaine's position would have been forced to quit. *See Block v. Kwal-Howells, Inc.*, 92 F. App'x 657, 662 (10th Cir. 2004); *cf. Lockheed Martin Corp. v. Admin. Rev. Bd., U.S. Dep't of Lab.*, 717 F.3d 1121, 1134 (10th Cir. 2013) (concluding that an employee could have been constructively discharged in part because she "was told she would be … considered for a layoff and kept in a constant state of uncertainty as to whether she would continue to have a job"); *Acrey v. Am. Sheep. Indus. Ass'n*, 981 F.2d 1569, 1574–75 (10th Cir.1992) (affirming constructive discharge finding when employee's "supervisor had confronted her with a litany of performance shortcomings; long-standing job responsibilities were taken from her; and she received inadequate information and training to perform her new duties").

At base, the cases concluding that resignations can constitute adverse employment action involve compelled or illusory resignations. *See Williams*, 497 F.3d at 1087 (noting that "consequences befalling the plaintiff outside the employment environment" may suffice); *see also, e.g.*, *Barone v. United Airlines, Inc.*, 355 F. App'x 169, 181 (10th Cir. 2009) (concluding that a forced choice between relocation and resignation was adverse action); *McInerney v. United Air Lines, Inc.*, 463 F. App'x 709,

16

716 (10th Cir. 2011) (concluding that a jury could find that a defendant terminated a plaintiff where defendant merely "deem[ed]" that plaintiff had resigned). Blaine's was voluntary and genuine, even if she would have preferred to stage it across two weeks. *See* Doc. 53 at 14–15, ¶¶ 32, 34. She does not explain why leaving early, with pay, is materially adverse—nor why a reasonable employee would see it that way.

### C

Finally, Blaine makes a sex-discrimination claim, again based on circumstantial evidence that requires *McDonnell Douglas* burden-shifting. A prima facie case of sex-discrimination requires Blaine to establish that she belongs to a protected class, suffered an adverse employment action, and that the challenged action "took place under circumstances giving rise to an inference of discrimination." *Ford*, 45 F.4th at 1215. Blaine is female, *see* Doc. 49 at 29, and thus a member of a protected class, *see Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1045 (10th Cir. 2020). Her claim fails because the evidence fails to establish that she suffered an adverse employment action.

Blaine again relies upon a constructive discharge theory. Doc. 41 at ¶ 4.a.iii; Doc. 53 at 31–32. But she cannot meet that standard in the context of her sex-discrimination claim any more than she could in the context of her retaliation claim. *See Johnson v. Weld Cnty.*, 594 F.3d 1202, 1217 n.6 (10th Cir. 2010) (noting that if a plaintiff "fail[s] to meet the threshold required for a retaliation claim—a material adverse harm—it follows that those same facts cannot satisfy the higher threshold required for a constructive discharge claim"). So summary judgment is appropriate on this claim too.

### III

For the foregoing reasons, Mystere's Motion for Summary Judgment, Doc. 48, is GRANTED.

It is so ordered.

Date: July 25, 2024                    s/ Toby Crouse
                                       Toby Crouse
                                       United States District Judge